**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON<br><br>               Respondent,<br><br>        v.<br><br>RASHEED CHAFFA ECHOLS,<br><br>               Appellant. | DIVISION ONE<br><br>No. 82639-5-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — This is the second appeal to us by Rasheed Echols in this matter. In his first appeal, State v. Echols, No. 78969-4-I, (Wash. Ct. App. April 27, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/78694.pdf (Echols I), due to the trial court's legal error, we reversed Echols' termination from drug court and vacated his convictions of unlawful possession of payment instruments, second degree identity theft, second degree possession of stolen property, and possession of a controlled substance.

In this second appeal, which follows his subsequent drug court termination and conviction of the same offenses,[1] Echols contends that the trial court erred when it denied his CrR 8.3(b) motion to dismiss. He also asserts that the evidence presented by the State was insufficient to prove beyond a reasonable

---

[1] The possession of a controlled substance conviction was dismissed in light of State v. Blake, 197 Wn.2d 170, 481 P.3d 521 (2021) (holding RCW 69.50.4013(1) unconstitutional).

doubt that he intended to commit any crime. Finding no error and concluding that the evidence was sufficient to support the convictions, we affirm.

I

To address Echols' claims in this appeal, we repeat the facts set forth in Echols I.

On April 30, 2016, Echols was arrested for obstruction. When officers searched him incident to arrest, Echols possessed several debit cards belonging to other people. When officers asked Echols why he had other people's debit cards, he mentioned having a business, but did not provide further detail. After obtaining a search warrant, police found a large amount of other people's mail, debit cards, W-2 forms, and social security cards inside the vehicle that Echols was driving. Officers also found blank checks, washed checks, and fraudulent and altered checks. Drug paraphernalia, methamphetamine, and a variety of pills were also recovered from the vehicle.

Echols was charged with unlawful possession of payment instruments, second degree identity theft, second degree possession of stolen property, and possession of a controlled substance. The information did not specify which instruments formed the basis for the unlawful possession of payment charges. The second degree identity theft charge was based on Echol's [sic] possession of a passport and birth certificate belonging to Matthew Wilkinson. The second degree possession of stolen property charge was based on Echol's [sic] possession of a check issued to Elvis Gardner. The possession of a controlled substance charge was based on the methamphetamine recovered from the vehicle.

Echols entered into Adult Drug Treatment Court (drug court) to resolve his criminal charges on April 12, 2017. By entering into drug court, Echols agreed to waive his rights to a trial and stipulate to the admissibility of the police reports in the event that he was terminated from drug court. He also agreed to reside in Snohomish County while participating in drug court, obey all laws, abstain from using or possessing any substances, maintain honesty, and agreed not to associate with[ ] any known drug users or possessors.

Echols participated in drug court sessions for over a year and claimed he had maintained his sobriety for over five hundred days. Shortly before Echols was scheduled to graduate drug court, he was federally indicted for conspiracy to distribute controlled substances under Title 21, U.S. Code sections 812 and 841. On June 15, 2018, the trial court informed Echols that it received the

> indictment and that it would take him into custody and terminate him from drug court.
>
> On June 22, 2018, the State moved to terminate Echols from drug court alleging that Echols was in violation of his agreement by not abiding by all laws, and by associating with known drug dealers and users. Echols objected, contending that while the burden of proof for the indictment is for probable cause, the court must find that Echols breached his contract by a preponderance of the evidence. Echols argued that the court needed more evidence than the indictment to find him in violation of his contract with the drug court. The court disagreed and terminated Echols from drug court. The court found that Echols violated the drug court agreement by residing outside of Snohomish County, failing to obey all laws, failing to abstain from using or possessing any substances, failing to maintain honesty, and associating with known drug users o[r] possessors. The court found Echols guilty of the four originally charged offenses at the termination hearing.

Echols I, No. 78969-4-I, slip op. at 1-3.

On appeal of the 2018 termination and convictions, Echols argued that the federal "indictment alone was insufficient to prove that he violated the drug court agreement by a preponderance of the evidence." Echols I, No. 78969-4-I, slip op. at 4. The State conceded "that the indictment itself was not sufficient evidence to terminate Echols." Echols I, No. 78969-4-I, slip op. at 4. We concluded that "[w]ithout any additional evidence, the record does not support a finding that Echols violated any portion of the agreement" and that "[b]ecause an indictment alone does not support a finding by the preponderance of the evidence, the trial court erred when it found that Echols violated his agreement with the drug court." Echols I, No. 78969-4-I, slip op. at 4. Therefore, we reversed the order terminating Echols from drug court, vacated his subsequent convictions, and remanded the matter to the superior court. Echols I, No. 78969-4-I, slip op. at 4.

Meanwhile, during the pendency of Echols I, on January 22, 2019, Echols pleaded guilty in federal district court to conspiracy to distribute controlled substances, in violation of Title 21, United States Code, sections 841(a)(1), (b)(1)(C), and 846. See United States v. Echols, No. 2:18-cr-00131-RAJ. In doing so, Echols agreed that the following facts supported his conviction for that crime:

> a. Within the past five years, and continuing until on or about June 6, 2018, Defendant knowingly and intentionally conspired with others known and unknown to distribute substances controlled under Title 21, United States Code, Section 812, including cocaine.
>
> b. Without limiting the foregoing, Defendant specifically admits that he agreed with other co-conspirators to acquire cocaine to redistribute to others. Defendant in fact obtained cocaine from members of the conspiracy and sold it to others in furtherance of the conspiracy. The conspiracy was based in the Western District of Washington.
>
> c. For the last few years, law enforcement has been investigating a Drug Trafficking Organization (DTO). Investigators have made controlled buys of illegal drugs, consulted with confidential sources, conducted surveillance, obtained numerous tracking warrants, pen registers, and search warrants, and obtained judicially authorized Title III wiretaps, among other investigative techniques. During the course of the investigation, law enforcement officers intercepted calls between Defendant and other co-conspirators who were his sources of supply.
>
> d. Without limiting the foregoing, and as an example, on February 15, 2018, while investigators were monitoring phones subject to a wiretap, Defendant admits that he called a phone identified as "Target Telephone 24" (TT24), known to be used by a co-conspirator. During the call, Defendant asked for "Holly Madison" (code for cocaine). Defendant and the co-conspirator discussed the wholesale price for the cocaine (about $900 an ounce) and what Defendant planned to sell it for (about $1,200 an ounce). Defendant admits that he asked for "fresh" (good quality) cocaine, and the co-conspirator assured him that his product was good.
>
> e. On February 26, 2018, Defendant again called the same co-conspirator. During that call, defendant asked the co-

conspirator for one and a half (ounces of cocaine). The co-conspirator complained about the small size of the order, and Defendant said he was just kidding, that he "owed him one" (money for cocaine previously provided) and he actually wanted "four/five" (4.5 ounces of cocaine). The two then discussed how much money Defendant had and agreed to meet. During a later call that same day, the Defendant and the same co-conspirator coordinate where they were meeting to do the cocaine deal. The Defendant indicates he has "three" ($3,000), and the co-conspirator reiterates that Defendant owed him one ($1,000) for a past deal. Defendant then asked the co-conspirator if he was going to "front" Defendant "two" (provide two ounces of cocaine on credit), and sought confirmation that the co-conspirator would be providing him with "four" (four ounces of cocaine total). The co-conspirator affirmed and said Defendant would owe him for two (the two ounces of cocaine provided on credit). The two then met in a parking lot in Seattle to do the exchange.

     f.     Defendant admits that on June 6, 2018, he was arrested at his residence in Bellevue, Washington. Defendant admits that at the time of his arrest, agents recovered scales, small amounts of drugs and drug paraphernalia, and an air pistol that looked like a real semiautomatic pistol, all at the residence and/or inside defendant's vehicle. Agents also recovered $1,788 in U.S. currency from Defendant's person. Defendant admits that the currency was the proceeds of the sale of controlled substances as part of the conspiracy.

     g.     Defendant further admits that during the criminal conduct set forth above, Defendant was under supervision in adult drug treatment court in the Snohomish County Superior Court, under case number 16-1-02578-31, for various identity-theft, fraud and drug possession offenses. Defendant's drug court contract was revoked due to Defendant's conduct that led to his charging and arrest in this case. Defendant was sentenced to a term of incarceration of 57 months on the Snohomish County matter on or about August 24, 2018, and is serving said sentence as of the date of this plea.

On April 9, 2019, the federal district court entered judgment on Echols' conviction and sentenced him to "18 months custody to be served consecutive to the sentence imposed in [the] Snohomish County Superior Court" matter.

Following our April 2020 opinion in Echols I, Echols was reinstated in drug court under the original terms of his drug court treatment program.

In April 2021, the State moved to terminate Echols from drug court based on his federal guilty plea and conviction. Echols then filed a CrR 8.3(b) motion to dismiss the State's charges against him based on a claim of "governmental misconduct" in the form of initiating the 2018 termination proceedings "on insufficient evidence." The trial court first denied Echols' motion. It then granted the State's motion to terminate him from drug court concluding, in part: "It's impossible to have a drug court program where somebody in the program is selling drugs."

After the termination ruling, the matter immediately proceeded to a stipulated bench trial on agreed documentary evidence, which included the affidavits of probable cause along with nearly 400 pages of other investigative materials. The trial court found Echols guilty as charged after the State moved to dismiss the possession of a controlled substance charge. The trial court then issued written findings of fact and conclusions of law, entered judgment on the convictions, and sentenced Echols to 57 months of confinement.

Echols appeals.

II

Initially, Echols contends that the trial court erred when it denied his CrR 8.3(b) motion to dismiss because the State's mismanagement of his first termination hearing resulted in his wrongful termination from drug court and forced him to a bench trial prematurely.[2] We see no error.

---

[2] Echols does not appeal from the April 2021 order terminating him from drug court.

CrR 8.3(b) provides that "[t]he court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's rights to a fair trial." To support dismissal under CrR 8.3(b), "a defendant must show both 'arbitrary action or governmental misconduct' and 'prejudice affecting [his or her] right to a fair trial.'" State v. Wilson, 149 Wn.2d 1, 9, 65 P.3d 657 (2003) (alteration in original) (quoting State v. Michielli, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997)).

"Governmental misconduct . . . 'need not be of an evil or dishonest nature; *simple mismanagement is sufficient.*'" Michielli, 132 Wn.2d at 239 (quoting State v. Blackwell, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993)). "Yet Washington courts have clearly maintained that dismissal is an extraordinary remedy to which the court should resort only in 'truly egregious cases of mismanagement or misconduct.'" Wilson, 149 Wn.2d at 9 (quoting State v. Duggins, 68 Wn. App. 396, 401, 844 P.2d 441 (1993)).

"A trial court's decision to dismiss under CrR 8.3(b) can be reversed only when a trial court has abused its discretion by making a decision that is manifestly unreasonable or based on untenable grounds." Wilson, 149 Wn.2d at 9 (citing Michielli, 132 Wn.2d at 240).

In this case, the State initiated the 2018 drug court termination proceedings and presented Echols' federal indictment as evidence that he violated his agreement with the drug court. As we concluded in Echols I, an indictment (which establishes probable cause) was alone insufficient proof of a

violation of that agreement. Echols now claims that the State's commencement of that termination based on the indictment alone constituted governmental misconduct. It did not. There was no wrongdoing by the State in that instance. Rather, the wrong, which we remedied in Echols I, was the trial court's legal error in failing to employ the proper preponderance of the evidence standard to render its termination decision. Beyond our reversal of the termination order and vacation of his convictions, Echols was entitled to nothing more.[3]

Because Echols did not present evidence that the State committed any misconduct or mismanagement, much less any "truly egregious" action requiring a dismissal under CrR 8.3(b), the trial court did not abuse its discretion by denying his motion to dismiss.[4]

III

Next, while Echols does not directly challenge the sufficiency of the charging document, he suggests that the information's use of the conjunctive "and" rather than the disjunctive "or" required the State to prove that he committed all the listed elements of each charge. We reject his suggestion.

The State alleged that Echols "possessed two or more payment instruments, alone or in combination, in the name of a person or entity, and with the routing number and account number of a person or entity, without permission

---

[3] Echols does not argue that, following our opinion in Echols I, he was entitled to dismissal of this case with prejudice.

[4] The trial court denied Echols' motion to dismiss, ruling that (1) it was an untimely challenge to the 2018 proceeding and (2) in 2018, the drug court "would have been aware" of other facts that showed Echols was in violation of his agreement with that court. However, we may affirm on any grounds supported by the record. State v. Costich, 152 Wn.2d 463, 477, 98 P.3d 795 (2004).

of that person or entity to possess such instrument(s), and with intent to deprive the person of such instrument, and that such acts were done with the intent to commit theft . . . , forgery . . . and identity theft." The unlawful possession of payment instruments statute is nearly identical but uses the disjunctive rather than the conjunctive to identify the offender's wrongful intentions. See RCW 9A.56.320(2)(a)(i) ("with intent either to deprive the person of possession of such payment instrument or to commit theft, forgery, *or* identity theft" (emphasis added)). The State repeated this pattern when it charged Echols with second degree identity theft in violation of RCW 9.35.020(1), (3)[5] and with second degree possession of stolen property proscribed by RCW 9A.56.160(1)(c).[6]

The State has a clear burden to prove beyond a reasonable doubt every essential element of a charged crime. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Vasquez, 178 Wn.2d 1, 6, 309 P.3d 318 (2013). However, it is well-established that the State is allowed to charge in the conjunctive but prove its allegations in the disjunctive. State v. Dixon, 78 Wn.2d 796, 802-03, 479 P.2d 931 (1971). The Dixon court made this clear, explaining:

> Acts or conduct described in a penal statute in the disjunctive or alternative may be pleaded in the conjunctive If the charge is in the conjunctive, the information is held to charge a

---

[5] The State charged that Echols "did knowingly obtain, possess, use and transfer a means of identification and financial information," but the statute forbids a person to "knowingly obtain, possess, use, *or* transfer a means of identification or financial information of another person." RCW 9.35.020(1) (emphasis added).

[6] The information alleged that Echols "did knowingly receive, retain, possess, conceal, and dispose of a stolen access device," while the statute says: "'Possessing stolen property' means knowingly to receive, retain, possess, conceal, *or* dispose of stolen property." RCW 9A.56.140(1) (emphasis added).

> single crime committed in any one or all of the ways charged
> Where, under a penal statute, a single offense can be committed in different ways or by different means and the several ways or means charged in a single count are not repugnant to each other, a conviction may rest on proof that the crime was committed by any one of the means charged.

78 Wn.2d at 802-03 (citations omitted).

Accordingly, contrary to Echols' assertion, the State was not required to prove that he intended to commit "theft" and "forgery" and "identity theft" in order to convict him of unlawful possession of payment instruments. Rather, it needed to establish any one of the three. Similarly, the State did not need to prove that he knowingly "obtained" and "possessed" and "used" and "transferred" a means of identification or financial information to sustain a conviction for second degree identity theft. Nor was the State required to prove that he knowingly "received" and "retained" and "possessed" and "concealed" and "disposed" of a stolen access device to convict him of second degree possession of stolen property. Echols' claim as to the State's burden fails.

IV

Finally, Echols claims that the State presented insufficient evidence to prove that he committed any of the crimes of conviction. We disagree.

A

Evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (appeal from a bench trial); State v. Green, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980)

(adopting the Jackson standard); State v. Salinas, 119 Wn.2d 192, 201-02, 829 P.2d 1068 (1992) (appeal from a bench trial). "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Jackson, 443 U.S. at 318-19 (quoting Woodby v. Immigration & Naturalization Serv., 385 U.S. 276, 282, 87 S. Ct. 483, 17 L. Ed. 2d 362 (1966)). Thus, when reviewing a criminal conviction, whether following a jury trial or bench trial, "Washington's *sole* evidentiary sufficiency standard is that which the Fourteenth Amendment requires." State v. Tyler, 195 Wn. App. 385, 394, 382 P.3d 699 (2016), aff'd on other grounds, 191 Wn.2d 205, 422 P.3d 436 (2018); see State v. Johnson, 188 Wn.2d 742, 758, 399 P.3d 507 (2017) ("Washington has adopted the federal standard for sufficiency review." (citing Green, 94 Wn.2d at 221)).

In reviewing the sufficiency of the evidence, all reasonable inferences from the evidence are drawn in favor of the State and interpreted most strongly against the defendant. State v. Hosier, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

B

In order to convict Echols of unlawful possession of payment instruments, the State had to prove that he (1) "possesses two or more checks or other payment instruments, alone or in combination," (2) "[i]n the name of a person or

11

entity, or with the routing number or account number of a person or entity," (3) "without the permission of the person or entity to possess such payment instrument," and (4) "with intent either to deprive the person of possession of such payment instrument or to commit theft, forgery, or identity theft." RCW 9A.56.320(2)(a)(i).

The documentary evidence shows that during the search of Echols' vehicle, police officers located "washed checks, altered/fraudulent checks, and blank checks," also with other "checks that had glued on addresses, names, and routing/account numbers." Officers also found "several pieces of papers that appeared to be cut outs of bank logos, account numbers, routing numbers, addresses, and names" and recovered a checkbook belonging to Byron and Dawn Lecomte that contained altered checks. "There were close to 40 different people's mail, debit cards, W-2 forms, social security cards" and other items "located inside the vehicle."

Several victims connected to the items located in Echols' vehicle issued written statements that they had not given Echols permission to possess their financial information or mail that contained their financial information.

There is no dispute that Echols possessed two or more checks or other payment instruments, in the names of other persons, along with routing and account numbers, without the permission of those persons. A reasonable inference can be drawn that Echols intended to commit a crime with these

documents, namely theft,[7] because he had no legitimate reason to be in possession of them. Further, a rational trier of fact can infer intent to commit these crimes based on Echols' possession of glued, washed, and altered checks, whose primary purpose is to deprive the account owners of their funds. The evidence was sufficient to support Echols' conviction.

C

Next, Echols claims his second degree identity theft conviction must be reversed because there is no evidence that he ever used or transferred Matthew Wilkinson's birth certificate and passport.

RCW 9.35.020(3) imposes criminal liability for "knowingly obtain[ing], possess[ing], us[ing], or transfer[ing] a means of identification or financial information of another person . . . with the intent to commit, or to aid or abet, any crime." Accordingly, the State was not required to prove that he actually "used" or "transferred" these items. Rather, the State was only required to establish that Echols obtained or possessed these materials with the intent to commit theft. It did so.

Here, the documentary evidence showed that Echols possessed Wilkinson's birth certificate and passport. These items were found among dozens of other stolen mail items and altered checks. Moreover, while being transported to jail, Echols told law enforcement that "anything in that car you find

---

[7] "Theft" means (a) "[t]o wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services," (b) "[b]y color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services," or (c) "[t]o appropriate lost or misdelivered property or services of another, or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020(1)(a)-(c).

is just a property crime and you know what I'll do for that, 2 months," "I've been to prison before," and "I aint trippin' but you jumped the gun girl." Based on this evidence, one could reasonable infer that Echols intended to commit other offenses, such as theft, for which he would be confined for a longer time if ultimately convicted. However, law enforcement "jumped the gun" and arrested Echols before he could follow through on his intent to commit other crimes. Based on the circumstances in which the birth certificate and passport were found, we conclude that the evidence was sufficient to convict Echols of second degree identity theft.

D

A conviction of second degree possession of stolen property requires the State to prove that Echols "possesse[d] a stolen access device."[8] RCW 9A.56.160(1)(c). Here, the State alleged that Echols possessed an access device identified as a check issued by Rainier Title LLC to Elvis Gardner. The evidence showed Echols declaring that what law enforcement found in his car was "just a property crime." The reasonable inference is that Echols initially acknowledged that he was in possession of stolen property. Thus, we conclude that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of this crime beyond a reasonable doubt.

---

[8] An "access device" is defined as "any card, plate, code, account number, or other means of account access that can be used alone or in conjunction with another access device to obtain money, goods, services, or anything else of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by paper instrument." RCW 9A.56.010(1).

14

The superior court's judgment is affirmed in all respects.

WE CONCUR: